# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| HOLTZMAN ENTERPRISES, INC., on behalf of itself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: |
| CONTINENTAL CASUALTY COMPANY | ) ) | JURY TRIAL DEMANDED |
| and | ) ) | |
| CNA FINANCIAL CORPORATION, | ) ) ) | |
| Defendants. | ) | |

## **PLAINTIFF'S CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................ 1

II.  THE PARTIES.................................................................................................... 4

III. JURISDICTION AND VENUE .......................................................................... 5

IV.  FACTUAL ALLEGATIONS .............................................................................. 6

    A.  The Global COVID-19 Pandemic ................................................................. 6

    B.  Steps Taken by Authorities to Control the Pandemic .................................... 9

    C.  The Damaging Impact of the COVID-19 Pandemic on Plaintiff and Similar Businesses ................................................................................................... 11

    D.  Plaintiff's Business Insurance Policy with Defendants................................ 13

    E.  Defendants' Denial of Plaintiff's Claim...................................................... 17

V.   CLASS ALLEGATIONS .................................................................................. 20

VI.  JURY DEMAND ............................................................................................... 25

    Count I: Business Income Breach of Contract.................................................... 25

    Count II: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to Business Income ................................................................... 26

    Count III: Declaratory Relief ............................................................................ 27

    Count IV: Extra Expense Breach of Contract.................................................... 29

    Count V: Breach of the Implied Covenant of Good Faith and Fair Dealing ...... 30

    Count VI: Declaratory Relief............................................................................ 31

    Count VII: Business Income Breach of Contract ............................................... 33

    Count VIII: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to Business Income ................................................................... 34

    Count IX: Declaratory Relief............................................................................ 35

    Count X: Extra Expense Breach of Contract ..................................................... 37

    Count XI: Breach of the Implied Covenant of Good Faith and Fair Dealing...... 38

Count XII: Declaratory Relief ............................................................................. 39

Count XIII: Violation of the Colorado Consumer Protection Act. ..................................... 41

VII. PRAYER FOR RELIEF .................................................................................. 44

PLAINTIFF HOLTZMAN ENTERPRISES, INC. ("Plaintiff"), individually and on behalf of other similarly situated persons and entities, makes the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiff, which are based on personal knowledge. Plaintiff brings this action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory and injunctive relief against CONTINENTAL CASUALTY COMPANY ("Continental"), and CNA FINANCIAL CORPORATION ("CNA") (collectively "Defendants"), demanding a trial by jury.

## I.   NATURE OF THE ACTION

1.   Plaintiff owns and operates nearly four dozen Great Clips franchised hair salons in Colorado and Missouri. To make sure that it would be protected if it was forced to temporarily cease some or all of its operations by unanticipated events beyond its control, it purchased a commercial insurance policy from Defendants covering the period of February 11, 2020-February, 11, 2021. That policy is attached hereto as Exhibit A.

2.   Aside from Plaintiff, many other businesses in Colorado and the United States have purchased insurance from Defendants to protect against losses from unexpected catastrophic events. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed because of direct physical loss of or damage to the property. This coverage, commonly known as "business interruption" or "business income" coverage, is standard in most all-risk commercial property insurance policies.

3.   Defendant CNA is an insurance holding company that provides commercial insurance to businesses through its subsidiary Defendant Continental. Among its offerings is Business

1

Interruption coverage, often called Business Interruption or Business Income coverage, offered to protect businesses from the risk of being forced to suspend their operations because of an unexpected disaster. As CNA states on its website promoting this coverage, "[n]othing should stand in the way of your ability to deliver your products, services and expertise to your customers":[1]



4.   Although on this web page, CNA mentions "events such as fire or wind damage," nothing in its policy is limited to damage from fire or wind. In fact, as shown below its policies cover all risks unless excluded or limited, and nothing excludes or limits the losses in this case.

5.   The very type of unanticipated event for which Plaintiff and other businesses needed protection occurred in early 2020. That event, the worst health crisis to hit the States of Colorado and Missouri, the United States, and indeed the world in over a century, was a worldwide

---

[1] https://www.cna.com/web/guest/cna/ps/products/CT-AnyBusinessInterruptionProdML?industry=AnyIndustry&specialization=AnySpecialization&businessSize=AnySize (accessed 7/13/2020).

pandemic of a disease called COVID-19. It caused a massive number of illnesses and an extraordinarily high number of deaths.

6.    As a result of the pandemic and to protect against its spread, on March 19, 2020, the Colorado Department of Public Health ordered all hair salons closed.[2] Missouri counties where Plaintiff's salons are located issued stay-at-home orders around the same time that had the same effect.

7.    These restrictions – and indeed, the pandemic itself – have had a devastating effect on businesses throughout the country. Because Plaintiff and other businesses sustained a loss of their ability to access and use their property, they have sustained unimaginable business losses. They also incurred extra expenses due to having to purchase protective equipment upon re-opening.

8.    Those losses and expenses are covered in Defendants' policies, which provide that CNA will pay for the loss of business income due to a necessary suspension of operations caused by direct physical loss of or damage to property.

9.    However, despite this provision of business interruption coverage in its policies, Defendants are refusing to comply with their obligation to pay for business income losses and covered expenses incurred by policyholders as a result of the physical loss of their property.

10.    CNA publicly proclaims that refusal on its website, but in doing so, it misstates what its policies provide. It states that coverage requires "loss or damage *to* insured property."[3] However, its policies provide for coverage where there is "loss *of* or damage to property." Plaintiff and

---

[2] https://drive.google.com/file/d/1aMOxiYDg1lI2U0EbkpyK8bBQT0sWJJhT/view (accessed 7/13/2020).
[3] https://www.cna.com/web/wcm/connect/a81b05f0-582f-43e5-96d6-9cf912b281c9/CNA+Notice+to+Agents+Brokers+and+Policyholders+BI+Coverage+Info.pdf?MOD=AJPERES (accessed 7/15/2020) (highlighting added).

similarly situated businesses suffered loss of their property because they were unable to access it to operate their businesses. But CNA prefers to ignore that little, but vital, word "of."

11. Plaintiff therefore brings this action on behalf of itself and similarly situated businesses that (a) purchased standard commercial property insurance policies from Defendants that provide for business income loss and extra expense coverage and do not exclude coverage for pandemics and (b) have suffered business income and extra expense losses.

12. This action also seeks a declaratory judgment that Defendants are contractually obligated to pay these losses. In addition, Plaintiff seeks damages, attorneys' fees and costs, and any other relief that this Court deems equitable and just, arising out of Defendants' breach of contract and wrongful conduct alleged herein.

## II.  THE PARTIES

13. Holtzman Enterprises, Inc., is a Missouri corporation that is qualified to transact business as a foreign corporation in Colorado, with a principal office at 8501 Turnpike Dr., Ste 103, Westminster, CO 80031; it operates approximately 30 franchised Great Clips hair salons in Colorado and 14 in Missouri.

14. Defendant CNA is an insurance holding company incorporated in Delaware with its principal place of business at 151 N. Franklin Street, Chicago, IL 60606. It sells commercial insurance policies through Defendant Continental.

15. Defendant Continental is an insurance company incorporated in Illinois with its principal place of business at 151 N. Franklin Street, Chicago, IL 60606.  Defendant Continental registered with the Office of the Colorado Secretary of State to transact business transact in the state beginning in at least 1996 and has done business in Colorado continuously since that time.

4

### III. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because there is complete diversity between Defendants and at least one member of the class; there are more than one hundred members of the class; and the amount in controversy in the claims of the Class exceeds $5,000,000.00, exclusive of interest and costs. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part, if not all, of the acts and omissions complained of in this action took place in this district.

18. This Court has personal jurisdiction over Defendant Continental because, according to the policy with the "Insured Name and Address" of Holtzman Enterprises Inc, 8501 Turnpike Dr., Ste 103, Westminster, Colorado 80031," which covered approximately 30 locations in Colorado, coverage was provided by Defendant Continental. *See* Ex. A at 6, 204

19. A number of facts establish this Court's personal jurisdiction over Defendant CNA:

    a. The Policy is a "CNA Connect®" policy. Ex. A at 6, 204. According to CNA's website, "CNA Connect®" is "*our* business owners policy."[4]

    b. The Policy states: "THE BILLING FOR THIS POLICY WILL BE FORWARDED TO YOU DIRECTLY FROM CNA" and the premium of $35,469.00 "WILL BE INVOICED BY CNA ON A SEPARATE STATEMENT ACCORDING TO THE PAYMENT OPTION YOU SELECT." Ex. A at 205.

---

[4] https://www.cna.com/web/guest/cna/ps/products/ct-retcnaconnectprodsany. (accessed 7/20/2020; emphasis added).

    c.   CNA did in fact bill Plaintiff with invoices sent to Plaintiff's address in Colorado. *See*, *e.g.*, Ex. B (invoice dated 1/20/2020 from CNA to Plaintiff's address in Colorado.

    d.   Plaintiff paid the invoices with checks made out to "CNA Insurance."

    e.   CNA maintains an office in Littleton, CO, that it calls the "Denver Branch."[5]

## IV. FACTUAL ALLEGATIONS

### A.  The Global COVID-19 Pandemic

20. According to the World Health Organization ("WHO"), COVID-19 is an infectious disease for which there are no vaccines or treatments.[6] It spreads easily from person-to-person.[7]

21. When an infected person coughs, sneezes, or even just talks, droplets with the infectious agent fly into the air from the person's nose or mouth and can thereby infect others. This can occur even if the person is asymptomatic.[8] As WebMD states, "Some people who don't know they've been infected can give it to others. This is called asymptomatic spread. You can also pass it on before you notice any signs of infection, called presymptomatic spread."[9]

22.  Thus, there is no way to know whether a person with whom one comes into contact might be spreading the disease.

23. The coronavirus can live in the air for up to three hours, be breathed in by others, and get into their lungs, where it can infect them.[10]

---

[5] https://www.cna.com/web/guest/cna/about/locations (accessed 7/20/2020).
[6] https://www.who.int/health-topics/coronavirus#tab=tab_1 (accessed 5/10/2020).
[7] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=On%20March%2011%2C%20the,of%20new%20influenza%20viruses. (accessed 5/10/2020).
[8] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 5/10/2020).
[9] *Id.*
[10] *Id.*

24. The coronavirus can also infect people who touch surfaces, such as countertops, furniture, doorknobs and other surfaces in a business that contain the virus. It can live on plastic and stainless steel for up to three days.[11]

25. According to the Centers for Disease Control, COVID-19 can cause mild to severe symptoms, such as cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat and loss of taste or smell.[12]

26. COVID-19 is a new disease. The first known outbreak was a cluster of cases of pneumonia in Wuhan, Hubei Province in China in December 2019.[13] The disease did not even have an official name when WHO declared a "Public Health Emergency of International Concern" on January 30, 2020.[14] The disease was given its name by WHO on February 11, 2020, short for "coronavirus disease 2019." [15]

27. After it was discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[16]

28. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[17] To be classified as a pandemic, WHO requires "the worldwide spread of a new disease."[18]

---

[11] *Id.*
[12] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (accessed 5/22/2020).
[13] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[14] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 5/10/2020).
[15] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 5/10/2020).
[16] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[17] https://www.merriam-webster.com/dictionary/pandemic (accessed 5/11/2020) (accessed 5/10/2020).
[18] https://www.who.int/csr/disease/swineflu/frequently_asked_questions/pandemic/en/ (accessed 5/10/2020).

29. At the point that WHO called COVID-19 a pandemic on March 11, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries; more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[19]

30. According to the COVID Tracking Project, by that same date, March 11, 2,873 patients had tested positive in the United States, and 43 patients had died. From that date on, the number of cases and deaths increased exponentially. By March 19, when the State of Colorado ordered all hair salons, along with other businesses, closed, the number of cases nationwide had increased nearly seven times to 19,770, and the number of deaths had increased nearly five times to 199.[20]

31. Colorado was hit by COVID-19 later than other states, but once it arrived it spread rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there were 28 cases in Colorado and no deaths. But by the time the State closed non-essential businesses including hair salons, the number of cases had increased to 216 reported cases, with two deaths. By late April, Colorado was averaging more than 600 new cases , roughly 1,000 hospitalizations, and 40 deaths a day.[21]

32. As of July 14, 2020, according to the *New York Times*, 2.4 million Americans had tested positive, and 135,400 had died.[22] That was more than any other country in the world and the 10th and 9th highest on a per capita basis, respectively.[23]

---

[19] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 5/10/2020).
[20] https://covidtracking.com/data/us-daily (accessed 7/13/2020).
[21] https://covidtracking.com/data/state/colorado (accessed 7/13/2020).
[22] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 7/14/2020).
[23] *Id.*

**B. Steps Taken by Authorities to Control the Pandemic**

33. On March 13, 2020, the White House issued a proclamation declaring "that the COVID-19 outbreak in the United States constitutes a national emergency"; it specified that the emergency had actually begun March 1, 2020.[24]

34. Three days earlier, Governor Jared Polis had declared a state of emergency in Colorado.[25]

35. On March 13, Governor Mike Parson signed an executive order declaring a state of emergency in Missouri due to COVID-19.[26]

36. In Public Health Order 20-22, the Colorado Department of Public Health and Environment ordered that all nonessential personal services, including hair salons, be closed to ingress, egress, use, and occupancy by members of the public beginning at 8:00 AM March 19, 2020, through April 30.[27]

37. On March 25, 2020, Governor Polis ordered all Coloradans to stay at home, subject to limited exceptions, beginning the next day at 6:00AM and extending through April 11. He also directed all businesses other than those designated as "Critical Businesses" under Public Health Order 20-24, to close.[28] Hair salons did not qualify as Critical Businesses, and therefor they were ordered closed.[29]

---

[24] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (accessed 5/21/2020).
[25] https://www.colorado.gov/governor/news/gov-polis-provides-update-states-response-covid-19 (accessed 7/14/2020).
[26] https://governor.mo.gov/press-releases/archive/governor-parson-signs-executive-order-20-02-declaring-state-emergency (accessed 5/19/2020).
[27] https://drive.google.com/file/d/1aMOxiYDg1ll2U0EbkpyK8bBQT0sWJJhT/view (accessed 7/14/2020).
[28] Executive Order D 2020 017, https://www.colorado.gov/governor/sites/default/files/inline-files/D%202020%20017%20Ordering%20Coloradans%20to%20Stay%20at%20Home_0.pdf (accessed 7/14/2020).
[29] https://drive.google.com/file/d/1ndUBYTXVM7yULGMiDPRhjVrUj8qTF2pk/view (accessed 7/14/2020).

9

38. Governor Polis extended until April 26 and again until May 4 the order that businesses other than Critical Businesses be closed.[30]

39. Various local jurisdictions where Plaintiff's Colorado salons are located issued similar orders. Denver was typical. On March 16, it adopted the state's Stay at Home orders.[31] Those orders were ultimately extended through May 8.[32] On May 8, Denver finally allowed hair salons to reopen the following day.[33]

40. Similar restrictions were ordered in Missouri. On April 3, 2020, the Missouri Department of Health and Senior Services issued a "Stay at Home" Order,[34] which did not allow individuals to leave home to visit hair salons. After an extension, that Order remained in effect through May 3, 2020.[35]

41. Orders closing hair salons were put into effect at the County level in Missouri even earlier. For instance, on March 21, 2020, St, Louis County Executive Dr. Sam Page issued an Executive Order commanding the Director of the St. Louis County Department of Public Health to issue an order directing that "people stay home when possible" other than, inter alia, to "perform tasks *essential* to the health and safety of individuals, their families, their household

---

[30] Executive Order 2020 024, https://www.colorado.gov/governor/sites/default/files/inline-files/D%202020%20024%20Amending%20and%20Extending%20Executive%20Order%20D%202020%20017%20Stay%20at%20Home%20Order_0.pdf; Executive Order D 2020 044, https://www.colorado.gov/governor/sites/default/files/inline-files/D%202020%20044%20Safer%20at%20Home.pdf (accessed 7/14/2020).
[31] https://www.denvergov.org/content/dam/denvergov/Portals/covid19/documents/public-orders/DenverStayAtHomeOrder_DDPHE.pdf (accessed 7/16/2020).
[32] https://www.denvergov.org/content/denvergov/en/mayors-office/newsroom/2020/City-and-County-of-Denver-COVID-19-Response-Update.html (accessed 7/16/2020).
[33] https://www.denvergov.org/content/denvergov/en/covid-19/coronavirus-news/may-2020/denver-sets-criteria-for-businesses-reopening.html (accessed 7/16/2020).
[34] https://governor.mo.gov/priorities/stay-home-order (accessed 5/19/2010).
[35] https://governor.mo.gov/priorities/stay-home-order (accessed 5/19/2020).

members, and their pets, such as … visiting a health care professional or hospital ….”[36] That order did not allow visits to hair salons. That same day the County Director of Public Health issued an Amended Stay at Home Order that did not allow hair salons to remain open.[37] That order was extended on April 20.[38]

42. Similarly, as of March 23, 2020, hair salons were ordered closed in the City of St. Louis through April 22, later extended indefinitely.[39]

43. On March 23, 2020, St. Charles County Executive Ehlmann issued an order that every person in the County must remain in their residence or surrounding property except to engage in "(a) activities they deem essential to their physical, mental, and spiritual well-being, or (b) employment ….”[40] That ruled out visiting hair salons.

44. St. Louis County, where most of Plaintiffs' Missouri salons are located, didn't allow reopening of hair salons and other businesses until May 18.[41]

**C. The Damaging Impact of the COVID-19 Pandemic on Plaintiff and Similar Businesses**

45. The COVID-19 pandemic, along with the restrictions described above, have had a devastating impact on Plaintiffs' business.

46. All of Plaintiff's salons in Colorado and Missouri closed on March 19 because of the pandemic, the day that the State of Colorado ordered all hair salons closed.

---

[36] https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (accessed 5/21/2020) (emphasis added).
[37] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-amended-stay-at-home-order/ (accessed 5/21/2020).
[38] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-extension-and-amendment-of-stay-at-home-order/ (accessed 7/17/2020).
[39] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commission-s-Order-5-03-21-2020.pdf (accessed 7/14/2020).
[40] https://www.sccmo.org/DocumentCenter/View/15365/20-06-Executive-Order-PDF (accessed 5/21/2020).
[41] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 7/14/2020).

47. After the State of Colorado allowed hair salons to re-open on May 9, Plaintiff began to prepare to re-open its Colorado salons. It was able to reopen ten Colorado salons on or about May 11, approximately another ten on or about May 18 and the balance by May 31.

48. After St. Louis County allowed hair salons to reopen on May 18, Plaintiff was able to reopen most of its Missouri salons later that week and the rest shortly thereafter.

49. Three of Plaintiff's salons were permanently closed.

50. The timing of these re-openings was affected by the enormous work involved in reopening more than 40 salons. In addition, a number of Plaintiff's employees were uncomfortable coming back, leading to staffing issues that had to be resolved before the salons could reopen.

51. To comply with various county and city requirements, Plaintiff has had extra expenses since reopening because of the need to purchase items such as additional hand sanitizers, masks/face guards, disinfectants, and capes. Plaintiff has also had to hire receptionists to maintain customer social distancing.

52. Since reopening, Plaintiff's business has continued to be adversely affected because of the pandemic. For instance, Plaintiff's business has been impacted by the need to meet social distancing requirements in its salons and the requirement to take only appointments rather than walk-ins.

53. Nationwide the hair salon industry has been devastated by COVID-19. One survey found that 70% had to furlough or layoff staff during the shutdown over the pandemic. The survey was conducted from May 15-June 5. Only 23% had reopened at the time they responded. [42] .

---

[42] https://salonspanetwork.org/beauty-pulse-survey-covid-19-recovery/ (accessed 7/16/2020).

54. The Professional Beauty Association states: "Salons across the country are struggling financially and many will not make it through this crisis."[43]

**D.  Plaintiff's Business Insurance Policy with Defendants**

55. In exchange for premiums paid by Plaintiff to Defendants, Plaintiff obtained an insurance policy under Policy Number B 1010814757, issued to Holtzman Enterprises Inc., 8501 Turnpike Dr., Ste 103, Westminster, CO 80031, covering a Policy Period from 2/11/2020 to 2/11/2021 (Exhibit A at 5; "the Policy").

56. The Policy contains a "Forms and Endorsements Schedule" showing Forms, Schedules and Endorsements "that are a part of this policy." Ex. A at 48. One of those Forms is "Business Income and Extra Expense," shown as having the Form number SB146802E. *Id.*

57. The "Business Income and Extra Expense Form," Form SB146802E, modifies the Businessowners Special Property Form. It states:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by *direct physical loss of* or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

Ex. A at 88 (emphasis added).

58. As can be seen, the Policy provides coverage not just for *damage* to property at the premises, but also for "loss of" property. Plaintiff suffered loss of property when the COVID-19 pandemic prevented it from using its property for its intended business functions of operating a hair salon.

---

[43] https://www.probeauty.org/advocacy/fica (accessed 7/16/2020).

59. The Policy's Renewal Declaration states that Business Income and Extra Expense Coverage includes "12 Months Actual Loss Sustained." Ex. A at 6.

60. The Policy's Renewal Declaration contains a Schedule of Locations that lists 44 locations where Plaintiff's salons are located. Ex. A at 7-38. Thus, those 44 salons are all covered under the Business Income and Extra Expense coverage.

61. The Business Income and Extra Expense Form defines Business Income as the:

    a.  Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred … [and]

    b.  Continuing normal operating expenses incurred, including payroll …..

Ex. A at 88.

62. The Policy also covers Extended Business Income for losses that occur after the property is restored, as follows:

If the necessary "suspension" of your "operations" produces a Business Income loss payable under Paragraph 1, we will pay for the actual loss of Business Income you sustain during the period that:

a. Begins on the date property is actually repaired, rebuilt or replaced and "operations" are resumed; and

b. Ends on the earlier of:

(1) The date you could restore your "operations" with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage occurred; or

(1) 60 consecutive days after the date determined in paragraph a. above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of loss in the area where the described premises are located.

Ex. A at 89.

63. "Suspension" means "[t]he partial or complete cessation of your business activities ...." Ex. A at 85. That applies to Plaintiff's Business Income losses because, as a result of the COVID-19 pandemic, its business activities partially or completely ceased.

64. "Operations" means "the type of your business activities occurring at the described premises ...." Ex. A at 83. That applies to Plaintiff's operation of its salons.

65. For Business Income coverage, "period of restoration ... [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises" and ends when business is resumed. Ex. A at 83.

66. The COVID-19 pandemic caused a direct physical loss of property at Plaintiff's premises at the Scheduled Locations by denying Plaintiff the ability to physically access and use the property in the normal fashion in its business and/or denying its members and others the ability to physically access and use the property. It is therefore a covered loss.

67. The Policy sets forth the method to determine the amount of Business Income loss. It states that it will be determined based on:

(1) The Net Income of the business before the direct physical loss or damage occurred;

(2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any likely increase in Net Income attributable to an in the volume of business as a result if [sic] favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4) Other relevant sources of information, including:

(a) Your financial records and accounting procedures;

(b) Bills, invoices and other vouchers; and

15

(c) Deeds, liens or contracts.

Ex. A at 78.

68. The Policy also covers Extra Expense, which "means reasonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss." Ex. A at 89.

69. The Policy sets forth the method of determining recoverable Extra Expense. It states that it will be based on:

(1) All reasonable and necessary expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

(a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

(b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) All reasonable and necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

Ex. A at 78.

70. The COVID-19 pandemic is a "covered cause of loss" under The Policy. Covered Causes of Loss are described as follows:

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

a. Excluded in Section B. EXCLUSIONS;

b. Limited in paragraph A. 4. Limitations; or

c. Excluded or limited by other provisions of this policy.

16

71. None of the Exclusions or Limitations, or limits in the Policy apply to Plaintiff's losses from the COVID-19 pandemic. In particular, there is no exclusion for losses caused by a virus or pandemic. Accordingly, Plaintiff's losses are due to a covered cause.

72. The Policy also contains a provision, entitled "Civil Authority" that provides for Business Income and Extra Expense Coverage where the loss is "caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property other than described premises, caused by or resulting from a Covered Cause of Loss." Ex. A at 114.

73. Because Plaintiff was prohibited from accessing its premises by government orders due to direct physical loss of or damage to locations other than Plaintiff's described premises – namely locations contaminated by the coronavirus – it is covered by this provision.

74. For the above reasons, Plaintiff and Class Members are entitled to coverage under the above provisions of the Policy.

**E. Defendants' Denial of Plaintiff's Claim**

75. Defendants have taken no steps to cover their insureds for their COVID-related business losses. To the contrary, they tell insureds and the public that these business losses are not covered.

76. CNA has a web page entitled, "Helping Our Customers Navigate COVID-19" in which it says, "We're Here to Help":[44]

---

[44] https://www.cna.com/web/guest/cna/sp/helping-our-customers-navigate-covid-19 (accessed 7/15/2020).



77. Although CNA says it's "here to help," nowhere on this page does Defendant CNA acknowledge to its customers that their COVID-19 losses are covered by any of their policies. By omitting that acknowledgement, Defendant CNA is attempting to convey the message that these losses are not covered.

78. That page has a link to "Business Interruption Coverage Information." *Id*. Clicking on that link brings up a page entitled, "Notice to Agents, Brokers and Policyholders – Business Interruption Coverage Information," which attempts to convince policyholders that they are not covered for COVID-19 losses. But in doing so, it *misstates what its policies provide*:[45]

---

[45] https://www.cna.com/web/wcm/connect/a81b05f0-582f-43e5-96d6-9cf912b281c9/CNA+Notice+to+Agents+Brokers+and+Policyholders+BI+Coverage+Info.pdf?MOD=AJPERES (accessed 7/15/2020) (highlighting added).

18



**Notice to Agents, Brokers and Policyholders – Business Interruption Coverage Information**

CNA Center
151 N Franklin Street
Chicago, IL 60606
www.cna.com

Many property insurance policies issued by the CNA insurance companies include business interruption coverage. Because coverage varies across policies, you will need to read your policy and consult with your insurance broker or agent for more specific information. In general, however, in order to qualify for business interruption, you first would need to establish direct physical loss or damage, caused by a covered peril, to your covered property and/or property at a covered location. To invoke coverage for business interruption, that direct physical loss or damage must cause an interruption to your business. An example of a business interruption loss is a fire in your office that requires you to suspend your business activities because the fire has caused direct physical loss or damage to insured property.

79. That statement is wrong, and CNA must know that it is wrong. Its policies do not simply cover "loss or damage *to* insured property." As shown above, they provide coverage for a "physical loss *of* or damage to" property. In purporting to describe its policies, CNA omitted the word "of" to make it appear that a "loss *of* property" is not covered. But a "loss of property" is covered.

80. Because of that word "of," Plaintiff's losses and those of Class Members are covered in that they had a loss of their property due to the COVID-19 pandemic.

81. An insurance policy is, ultimately, simply a contract where the insured agrees to pay insurance premiums and the insurance company agrees to pay the insured, up to the policy limits, for losses covered by the policy. However, unlike most contracts, the insurer is usually not called upon to perform (since, after all, insurance protects against the unexpected). When the insurer's performance is required, it only arises when the insured is, by definition, in a desperate financial position. Once a loss occurs, an insured can no longer buy protection for that loss from

19

competing insurers – in essence, the insurer has exclusive and complete control over the evaluation, processing and denial of that claim.

82.  The implications of this disparity here is clear. Defendants' strategy is to discourage policyholders from making claims in the hope that it will never even have to face their claims, much less pay them.

83.  Despite that strategy, Plaintiff made a claim on its policy through counsel on July 9, 2020, asking Continental to respond by July 16. (Ex. C.)

84.  Michael P. Cambre, CNA's Claim Specialist – Property Field and Catastrophe Claim, has responded twice with questions, such as asking Plaintiff to "send in the governmental mandates specific to the insured's business closings." Plaintiff answered those questions fully through counsel, for example by providing citations to the government orders that mandated closing of hair salons in Plaintiff's area of business – even though those orders are publicly available and presumably a multi-billion dollar insurance company like CNA was already well-aware of them. (Ex. D.)

85.  Despite responding twice with questions, CNA did not provide a decision by Plaintiff's requested date of July 16 and did not ask for more time to consider the claim. Plaintiff therefore concludes that the claim has been denied without even the courtesy of an explanation.

## V.  CLASS ALLEGATIONS

86.  Plaintiff brings this action on behalf of itself and as a representative of all others who are similarly situated. Pursuant to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of the following classes:

> a. All persons and entities with Business Income (including Extended Business Income) coverage under a policy issued by Defendants and that suffered

suspension of business due to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered losses (the "Business Income Coverage Class").

b. All persons and entities in Colorado with Business Income (including Extended Business Income) coverage under a policy issued by Defendants and that suffered suspension of business due to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered losses (the "Colorado Business Income Coverage Subclass").

c. All persons and entities with Extra Expense coverage under a policy issued by Defendants and that suffered suspension of business due to COVID-19, and for which Defendants have denied a claim for Extra Expense losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered Extra Expense losses (the "Extra Expense Coverage Class").

d. All persons and entities in Colorado with Extra Expense coverage under a policy issued by Defendants and that suffered suspension of business due to COVID-19, and for which Defendants have denied a claim for Extra Expense losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered Extra Expense losses (the "Colorado Extra Expense Coverage Subclass").

87. Excluded from each of the above Classes are Defendants, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

88. Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

89. This action has been brought and may be properly maintained on behalf of the Class and Subclasses proposed herein under Rule 23 of the Federal Rules of Civil Procedure.

90.  Numerosity. Fed. R. Civ. P. 23(a)(1). The members of each Class and Subclass number more than 100 and are so numerous that joinder of all members is impractical. The precise number of Class and Subclass members can be ascertained from Defendants' records.

91.  Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to each Class and Subclass, which predominate over any questions affecting individual members of each respective Class. These common questions of law and fact include, without limitation:

    a.  Whether Plaintiff and the Class and Subclass members suffered a covered loss under the common policies issued to members of the Class and Subclass;

    b.  Whether Defendants wrongfully denied all claims based on COVID-19;

    c.  Whether Defendants' Business Income coverage applies to a suspension of business caused by COVID-19 and/or in response to the presence or threat of COVID-19;

    d.  Whether Defendants' Extra Expense coverage applies to efforts to avoid or minimize a loss caused by COVID-19;

    e.  Whether Defendants have breached their contracts of insurance through a uniform and blanket denial of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19;

    f.  Whether Plaintiff and the Class and Subclass members suffered damages as a result of Defendants' actions.

92.  Typicality. Fed. R. Civ. P. 23 (a)(3). Plaintiff's claims are typical of the claims of the Classes and Subclasses it seeks to represent. Plaintiff and all Class and Subclass members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' unlawful conduct.

93.  Adequacy. Fed. R. Civ. P. 23(a)(4). Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions.

Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes and Subclasses.

94.   Superiority. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class and Subclass member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class or Subclass member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class and Subclass members will continue to suffer losses and Defendants' misconduct will proceed without remedy. Even if Class and Subclass members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Finally, Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

95.   Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2). Defendants' unlawful and unfair conduct is uniform as to all members of each Class. Defendants have acted or refused to act on grounds that apply generally to each Class and Subclass, so that final injunctive relief or declaratory relief is appropriate with respect to each Class and Subclass as a whole.

96.   In addition, particular issues are appropriate for certification under Fed. R. Civ. P. 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests thereon. Such particular issues include, but are not limited to:

a.   Whether the Business Income policies issued by Defendants cover Class members' business income losses and extra expenses due to the COVID-19 pandemic and public health and stay-at-home orders referred to herein;

b.   Whether Class members' Business Income losses and extra expenses are covered by the "Civil Authority" provisions in its policies;

c.   Whether the coverages for Business Income losses and extra expenses provided by Defendants' policies are precluded by exclusions or other limitations in those policies;

d.   Whether Defendants breached contracts by denying coverage for Business Income losses and extra expenses.

e.   Whether Defendants engaged in bad faith efforts to dissuade insureds from making claims for Business Income losses and extra expenses due to the COVID-19 pandemic;

f.   Whether Defendants violated the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1), *et seq*., by engaging in deceptive trade practices;

g.   Whether Plaintiff and Class members are entitled to actual damages and/or declaratory relief as a result of Defendants' wrongful conduct.

## VI. JURY DEMAND

97.  Plaintiff demands a trial by jury on all claims so triable.

### Count I: Business Income Breach of Contract
### (By Plaintiff and the Business Income Coverage Class)

98.  Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

99.  Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants.

100. Plaintiff's Policy and the policies of other Business Income Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

101. In the Policy, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded under the Policy, including losses caused by the COVID-19 pandemic. Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

102. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members lost Business Income and Extended Business Income.

103. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the Policy and other Class members' policies.

104. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

105. Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses. Accordingly, Defendants are in breach of the Policy and other Class members' policies.

106. Due to Defendants' breach of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable, in an amount to be proved at trial.

### Count II: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to Business Income
### (By Plaintiff and the Business Income Coverage Class)

107. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

108. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants.

109. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Business Income Coverage Class in the following respects:

    a. Unreasonably acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

    b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

    c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Class' claims;

    d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Class' policies;

    e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

26

f.   Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

g.   Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

h.   Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i.   Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class as they give to their own interests;

j.   Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k.   Unreasonably placing their own financial interests above the interests of Plaintiff and the Class;

l.   Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds; and

m.   Publicly misstating the terms of its Business Income policies in an attempt to dissuade policyholders from submitting claims.

110. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing.

111. As a result of this breach, Plaintiff and the Class have been damaged in an amount to be proven at trial.

**Count III: Declaratory Relief**
**(By Plaintiff and the Business Income Coverage Class)**

112. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

113. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants.

114. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

115. Plaintiff's Policy and the policies of other Business Income Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

116. In the Policy, Defendants expressly agree to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the policy. Specifically, Defendants promised to pay for losses of business income sustained as a result of a business suspension.

117. A covered loss has resulted in business suspensions, which have caused Plaintiff's and Class members' losses.

118. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the Policy and other Class members' policies.

119. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

120. Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the policy and other Class members' policies.

121. Plaintiff and the Class members seek a judicial determination of whether the policies provide coverage for Plaintiff's and Class members' losses.

122. An actual case or controversy exists regarding Plaintiff's and Class members' rights and Defendants' obligations under the terms of the Policy and Class members' policies.

### Count IV: Extra Expense Breach of Contract
### (By Plaintiff and the Extra Expense Coverage Class)

123. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

124. Plaintiff brings this claim individually and on behalf of the Extra Expense Coverage Class against Defendants.

125. Plaintiff's Policy and the policies of other Extra Expense Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

126. In the Policy, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

127. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiff and Class members to incur extra expenses.

128. The extra expenses triggered the Extra Expense Coverage under the Policy and other Class members' policies.

129. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

130. Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policy and other Class members' policies.

131. Due to Defendants' breach of the Policy and other Class member policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable, in an amount to be proved at trial.

**Count V: Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(By Plaintiff and the Extra Expense Coverage Class)**

132. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

133. Plaintiff brings this claim individually and on behalf of the Extra Expense Class against Defendants.

134. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Extra Expense Class with respect to the Extra Expense provisions in the following respects:

    a. Unreasonably acting or failing to act in a manner that deprives Plaintiff and the Class the benefits of their policies;

    b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

    c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Class' claims;

    d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Class' policies;

    e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

    f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

    g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

h.  Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i.  Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class as they give to their own interests;

j.  Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k.  Unreasonably placing their own financial interests above the interests of Plaintiff and the Class;

l.  Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds; and

m.  Publicly misstating the terms of its Business Income policies in an attempt to dissuade policyholders from submitting claims.

135. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

136. As a result of this breach, Plaintiff and the Class have been damaged in an amount to be proven at trial.

**Count VI: Declaratory Relief**
**(By Plaintiff and the Extra Expense Class)**

137. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

138. Plaintiff brings this claim individually and on behalf of the Extra Expense Class against Defendants.

139. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

140. Plaintiff's Policy and the policies of other Extra Expense Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

141. In the Policy, Defendants expressly agree to pay extra expenses incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

142. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members losses.

143. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiff's and Class members' losses.

144. The extra expenses triggered the Extra Expense Coverage under the Policy and other Class members' policies.

145. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

146. Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policy and other Class members' policies.

147. Plaintiff and the Class members seek a judicial determination of whether the Extra Expense provisions of the policies provide coverage for Plaintiff's and Class members' losses.

148. An actual case or controversy exists regarding Plaintiff's and Class members' rights and Defendants' obligations under the terms of the Extra Expense provisions of Plaintiff's Policy and other Class members' policies.

### Count VII: Business Income Breach of Contract
### (By Plaintiff and the Colorado Business Income Coverage Subclass)

149. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

150. Plaintiff brings this claim individually and on behalf of the Colorado Business Income Coverage Subclass against Defendants.

151. Plaintiff's Policy and the policies of other Colorado Business Income Coverage Subclass members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Subclass members' losses for claims covered by the policies.

152. In the Policy, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded under the Policy, including losses caused by the COVID-19 pandemic. Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

153. A covered loss has resulted in business suspensions, which have caused Plaintiff and Subclass members lost Business Income and Extended Business Income.

154. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the Policy and other Subclass members' policies.

155. Plaintiff and the other Subclass members have complied with all applicable provisions of their respective policies, including payment of premiums.

156. Defendants, without justification, have refused performance under the Policy and other Subclass members' policies by denying coverage for these losses. Accordingly, Defendants are in breach of the Policy and other Subclass members' policies.

157. Due to Defendants' breach of the Policy and other Subclass members' policies, Plaintiff and other Subclass members have suffered actual and substantial damages for which Defendants are liable, in an amount to be proved at trial.

**Count VIII: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to Business Income**
**(By Plaintiff and the Colorado Business Income Coverage Subclass)**

158. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

159. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Subclass against Defendants.

160. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Business Income Coverage Subclass in the following respects:

    a.   Unreasonably acting or failing to act in a manner that deprives Plaintiff and the Subclass of the benefits of their policies;

    b.   Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Subclass of the benefits of their policies;

    c.   Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Subclass' claims;

    d.   Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Subclass' policies;

    e.   Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Subclass' claims;

    f.   Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Subclass' claims;

    g.   Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Subclass' losses;

    h.   Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

    i.   Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Subclass as they give to their own interests;

    j.   Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

    k.   Unreasonably placing their own financial interests above the interests of Plaintiff and the Subclass;

    l.   Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds; and

    m.   Publicly misstating the terms of its Business Income policies in an attempt to dissuade policyholders from submitting claims.

161. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing.

162. As a result of this breach, Plaintiff and the Subclass have been damaged in an amount to be proven at trial.

**Count IX: Declaratory Relief**
**(By Plaintiff and the Colorado Business Income Coverage Subclass)**

163. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

164. Plaintiff brings this claim individually and on behalf of the Colorado Business Income Coverage Subclass against Defendants.

165. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

166. Plaintiff's Policy and the policies of other Business Income Coverage Subclass members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Subclass members' losses for claims covered by the policies.

167. In the Policy, Defendants expressly agree to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promised to pay for losses of business income sustained as a result of a business suspension.

168. A covered loss has resulted in business suspensions, which have caused Plaintiff and Subclass members losses.

169. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the Policy and other Subclass members' policies.

170. Plaintiff and the other Subclass members have complied with all applicable provisions of their respective policies, including payment of premiums.

171. Defendants, without justification, have refused performance under the Policy and other Subclass members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policy and other Subclass members' policies.

172. Plaintiff and the Subclass members seek a judicial determination of whether the policies provide coverage for Plaintiff's and Subclass members' losses.

173. An actual case or controversy exists regarding Plaintiff's and Subclass members' rights and Defendants' obligations under the terms of the Policy and Subclass members' policies.

**Count X: Extra Expense Breach of Contract**
**(By Plaintiff and the Colorado Extra Expense Coverage Subclass)**

174. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

175. Plaintiff brings this claim individually and on behalf of the Colorado Extra Expense Coverage Subclass against Defendants.

176. Plaintiff's Policy and the policies of other Extra Expense Coverage Subclass members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Subclass members' losses for claims covered by the policies.

177. In the Policy, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiff's and Subclass members' premises, to repair or replace any property, and other expenses.

178. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiff and Colorado Subclass members to incur extra expenses.

179. The extra expenses triggered the extra expense coverage under the Policy and other Subclass members' policies.

180. Plaintiff and the other Subclass members have complied with all applicable provisions of their respective policies, including payment of premiums.

181. Defendants, without justification, have refused performance under the Policy and other Subclass members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policy and other Subclass members' policies.

182. Due to Defendants' breach of the Policy and other Subclass member policies, Plaintiff and other Subclass members have suffered actual and substantial damages for which Defendants are liable, in an amount to be proved at trial.

### Count XI: Breach of the Implied Covenant of Good Faith and Fair Dealing
### (By Plaintiff and the Colorado Extra Expense Coverage Subclass)

183. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

184. Plaintiff brings this claim individually and on behalf of the Colorado Extra Expense Subclass against Defendants.

185. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Extra Expense Subclass with respect to the Extra Expense provisions in the following respects:

    a. Acting or failing to act in a manner that deprives Plaintiff and the Subclass the benefits of their policies;

    b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Subclass of the benefits of their policies;

    c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Subclass' claims;

    d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Subclass' policies;

e.  Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Subclass' claims;

f.  Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Subclass' claims;

g.  Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Subclass' losses;

h.  Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i.  Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Subclass as they give to their own interests;

j.  Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k.  Unreasonably placing their own financial interests above the interests of Plaintiff and the Subclass;

l.  Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds; and

m.  Publicly misstating the terms of its Business Income policies in an attempt to dissuade policyholders from submitting claims.

186. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

187. As a result of this breach, Plaintiff and the Subclass have been damaged in an amount to be proven at trial.

**Count XII: Declaratory Relief**
**(By Plaintiff and the Colorado Extra Expense Subclass)**

188. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

189. Plaintiff brings this claim individually and on behalf of the Colorado Extra Expense Subclass against Defendants.

190. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

191. Plaintiff's Policy and the policies of other Colorado Extra Expense Subclass members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiffs' and Subclass members' losses for claims covered by the policies.

192. In the Policy, Defendants expressly agree to pay extra expenses incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's and Subclass members' premises, to repair or replace any property, and other expenses.

193. A covered loss has resulted in business suspensions, which have caused Plaintiff's and Class members' losses.

194. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiff's and Subclass members' losses.

195. The extra expenses triggered the Extra Expense Coverage under the Policy and other Subclass members' policies.

196. Plaintiff and the other Subclass members have complied with all applicable provisions of their respective policies, including payment of premiums.

197. Defendants, without justification, have refused performance under the Policy and other Subclass members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policy and other Subclass members' policies.

198. Plaintiff and the Subclass members seek a judicial determination of whether the Extra Expense provisions of the policies provide coverage for Plaintiff's and Subclass members' losses.

199. An actual case or controversy exists regarding Plaintiff's and Subclass members' rights and Defendants' obligations under the terms of the Extra Expense provisions of Plaintiff's Policy and other Subclass members' policies.

### Count XIII: Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1), *et seq*. (By Plaintiff, the Colorado Business Income Coverage Subclass and the Colorado Extra Expense Subclass)

200. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

201. Defendants engaged in deceptive trade practices as defined by Colo. Rev. Stat. § 6-1-105 resulting in harm to Plaintiff and to the Colorado subclasses.

202. Defendants' deceptive trade practices included, but were not limited to:

a.    knowingly or recklessly making a false representation as to the characteristics or benefits of their Business Income, Extra Expense Coverage and Extended Business Income Coverage policies, and by failing to disclose material information concerning their Business Income, Extra Expense Coverage and Extended Business Income Coverage policy products, which information was known at the time of advertisement or sale, including: the true coverage that defendants intended to provide as a result of business interruption from catastrophes, C.R.S. 6-1-105(e);

b.    representing that its Business Income, Extra Expense Coverage and Extended Business Income Coverage policy products are of a particular standard, quality, or grade, when they knew or should have known that they are of another, C.R.S. 6-1-105(e);

c.    failing to disclose material information concerning its Business Income, Extra Expense Coverage and Extended Business Income Coverage products which information was known at the time of an advertisement or sale if such failure to disclose such

information was intended to induce the consumer to enter into a transaction, C.R.S. 6-1-105(e);

and

d.    Either knowingly or recklessly engaged in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice. C.R.S 6-1-105(kkk).

203. Defendants made false representations about the coverages that Defendants would provide under their Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance policies to Plaintiff individually and to the Colorado subclasses at the time of sale, intending that the representations induce Plaintiff individually and Colorado subclasses into purchasing the Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance policy products.

204. Defendants' failure to disclose such information was intended to induce the public and consumers at large to enter into transactions with Defendants for Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance.

205. The material information Defendants failed to disclose was information Defendants knew at the time of their advertisement or sale of their Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance policy products.

206. The actions of Defendants alleged herein were and are unfair acts or practices.

207. Defendants' deceptive trade practices occurred in the course of Defendants' business.

208. Defendants' deceptive trade practices significantly impacted Plaintiff and the public at large.  A large number of consumers in Colorado, and elsewhere, including Plaintiff were and continue to be directly affected by Defendants' deceptive trade practices. The consumers directly affected by the deceptive trade practices had minimal, if any, bargaining power.  The deceptive

practices have previously impacted Colorado consumers.  Defendants' deceptive trade practices have a significant potential to impact other consumers in the future.

209. Defendants engaged in bad faith conduct in their deceptive trade practices meaning they acted fraudulently, willfully, knowingly and/or intentionally, causing damages and losses to Plaintiff.

210. Colorado residents, including Plaintiff, were the targets of these deceptive trade practices were, and are, actual and potential consumers of Defendants' Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance products.

211. Plaintiff and Colorado class members suffered injury to their legally protected interests as a result of such deceptive trade practices.

212. Defendants' deceptive trade practices with regard to their Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance products directly and proximately caused actual damages and losses to Plaintiff and class members.

213. Such damages and losses include but are not limited to lost business income and extra expenses due to the COVID-19 pandemic.

214. These damages and losses are the direct and proximate result of Defendants' deceptive trade practices.

215. As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices of Defendants alleged herein, Plaintiff individually is entitled to relief under Colo. Rev. Stat. § 6-1-113, including, but not limited to, the greater of actual damages, statutory damages, or treble damages for bad faith conduct, injunctive relief, and attorneys' fees and costs, as allowable by law.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment against Defendants, as follows:

1. An order certifying appropriate classes and/or subclasses, designating Plaintiff as the class representative and its counsel as class counsel;

2. A judicial declaration declaring the meaning of the provisions concerning the business income coverage and extra expense coverage;

3. An award of damages to Plaintiff and the Class in an amount to be determined at trial;

4. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law;

5. An award of costs and attorneys' fees, as allowed by law; and

6. Such other or further relief as may be appropriate.

Dated: July 21, 2020                    Respectfully submitted,

By:  _/s/ Kevin S. Hannon_____
Kevin S. Hannon, #16015
THE HANNON LAW FIRM, LLC
1641 Downing Street
Denver, Colorado 80218
Tel: (303) 861-8800
Fax: (303) 861-8855
khannon@hannonlaw.com

And

Richard S. Cornfeld*
Daniel S. Levy*
LAW OFFICE OF RICHARD S. CORNFELD, LLC
1010 Market Street, Suite 1645
St. Louis, Missouri 63101
P. 314-241-5799
F. 314-241-5788

rcornfeld@cornfeldlegal.com
dlevy@cornfeldlegal.com

And

Anthony S. Bruning*
Anthony S. Bruning, Jr.*
Ryan L. Bruning*
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
P. 314-735-8100 / F. 314-898-3078
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

And

Alfredo Torrijos*
ARIAS SANGUINETTI WANG & TORRIJOS, LLP
6701 Center Drive West, 14th Floor
Los Angeles, CA
T: (310) 844-9696
F: (310) 861-0168
alfredo@aswtlawyers.com

***Attorneys for Plaintiff***

*bar admission to be submitted